| | | |
|---|---|---|
| | AUSA: Claire Sobczak | Telephone: (202) 591-5418 |
| AO 106 (Rev. 04/10) Application for a Search Warrant  Agent: | Andrew Crump | Telephone: (313) 670-5817 |

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. |
| Seaway Pharmacy | ) | Case: 2:20−mc−50138-1 |
| 8750 Telegraph Road, Suite 104, | ) | Judge: Hood, Denise Page |
| Taylor, Michigan 48180 | ) | Filed: 1/28/2020 |
| | | SEALED MATTER (LH) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See ATTACHMENT A.

located in the _____Eastern_____ District of _____Michigan_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC§ 1347, 18 USC§ 1343 | Health Care Fraud, Wire Fraud |
| 18 USC§ 1349 | Conspiracy to Commit Health Care Fraud and Wire Fraud |

The application is based on these facts:

See attached AFFIDAVIT.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Andrew Crump, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: _____January 28, 2020_____

_____
*Judge's signature*

City and state: ___Detroit, MI___

David R. Grand        U. S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

IN THE MATTER OF:
THE SEARCH OF

Case No. _____

**Filed Under Seal**

Seaway Pharmacy
8750 Telegraph Road, Suite 104,
Taylor, Michigan 48180

IRXPLUS.COM, INC.
(DBA St. Paul Pharmacy)
9934 Harper Avenue,
Detroit, Michigan 48213

NRK Rx Inc.
(DBA Food Town Drugs)
211 North Telegraph Road,
Monroe, Michigan 48162

Rockwood Pharmacy P.C.
32825 Fort Road,
Rockwood, Michigan 48173

Colosseum Inc.
(DBA ER Drugs)
27260 Eureka Road,
Taylor, Michigan 48180

625 Brentwood Drive,
Dearborn, Michigan 48124

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Andrew Crump, Special Agent for the Federal Bureau of Investigations, being duly sworn, depose and state as follows:

## **INTRODUCTION**

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), duly appointed according to law and acting as such, and have been employed as such since October 2014.   As a Special Agent in the FBI, I have received general law enforcement training at the FBI Academy, as well as specialized training on the subjects of health care fraud, money laundering and telephone analysis from the FBI, and I have been personally involved in investigations concerning health care fraud, prescription drug diversion and methods used to finance and conceal the profits of those operations.   I have interviewed numerous self-proclaimed drug users, medical doctors, and owners and employees of medical clinics.   I have investigated and conducted surveillance on numerous doctors, pharmacies and prescription drug dealers.   I have consulted with agents and officers of numerous federal, state, and local agencies in gaining an understanding of current trends in the diversion of prescription drugs and health care fraud.   I am currently assigned to the Detroit division of the FBI and my duties include investigating health care fraud and prescription drug diversion.

2

2.     As a Special Agent with the FBI, I am responsible for investigating violations of United States federal law, including, but not limited to, Title 18, United States Code, Section 1347 (Health Care Fraud); Title 18, United States Code, Section 1343 (Wire Fraud); Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud and Wire Fraud); 18 U.S.C. § 371 (Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks); and 42 U.S.C. § 1320a-7(b)(1)(A) and 1320a-7(b)(2)(A) (Payment and/or Receipt of Health Care Kickbacks).  In connection with investigating these offenses, I have participated in the execution of search warrants for documents and other evidence in cases involving violations of these offenses.

## **PURPOSE OF THE AFFIDAVIT**

3.     This affidavit is written in support of an application to search the premises located at 8750 Telegraph Road, Suite 104, Taylor, Michigan 48180 ("Subject Premises 1"), 9934 Harper Avenue, Detroit, Michigan 48123 ("Subject Premises 2"), 211 North Telegraph Road, Monroe, Michigan 48162 ("Subject Premises 3"), 32825 Fort Road, Rockwood, Michigan 48173 ("Subject Premises 4"), 27260 Eureka Road, Taylor, Michigan 48180 ("Subject Premises 5"), and 625 Brentwood Drive, Dearborn, Michigan 48124 ("Subject Premises 6"),  all within the Eastern District of Michigan.

4.     As discussed herein, the statements in this affidavit are based upon

information I learned during the investigation, information provided to me by other law enforcement agents, and my experience and background as an FBI Special Agent. Since this affidavit is being submitted for the limited purpose of supporting a search warrant, I have not included every fact known to me concerning this investigation. I have set forth only the facts I believe are necessary to establish probable cause to believe evidence of crime, fruits of crime, contraband, and other items illegally possessed in violation of the aforementioned federal laws are located at Subject Premises.

5.     Based on my training and experience, I know that, generally, pharmacies rely upon computers to create and store data, including billing data, patient files, and claims data. For the reasons stated below, it is likely that Seaway Pharmacy, IRXPLUS.COM, INC., NRK Rx, Inc., Rockwood Pharmacy P.C., and Colosseum Inc.'s  patient records, claims data, drug order history, and billings will be found stored on the computers located at Subject Premises. During the course of my investigation, I reviewed provider certifications for Seaway Pharmacy, IRXPLUS.COM, INC., NRK Rx, Inc., Rockwood Pharmacy P.C., and Colosseum Inc. These certifications indicate all of the pharmacies used SRS Systems as their software vendor.   In my previous experience conducting pharmacy fraud investigations, I know that one of the functions of SRS Systems is the submission of electronic health care claims.

4

6.     As discussed herein, there is probable cause to believe that within the Subject Premises there is located certain items and property, including but not limited to, financial records, patient files, computers, and other evidence and fruits and instrumentalities of violations of:

A. Title 18, United States Code, Section 1347, Health Care Fraud;

B. Title 18, United States Code, Section 1343, Wire Fraud;

C. Title 18, United States Code, Section 1349, Conspiracy to Commit Health Care Fraud and Wire Fraud;

D. Title 42 U.S.C. § 1320a-7b(b), Payment and/or Receipt of Health Care Kickbacks; and

E. Title 18 U.S.C. § 371, Conspiracy to Pay or Receive Health Care Kickbacks and/or Defraud the United States.

## **VIOLATION STATUTES**

7.     Title 18, United States Code, Section 1347, prohibits health care fraud: Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

(1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

5

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

8.      Title 18, United States Code, Section 1343, prohibits wire fraud:  Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

9.      Title 18, United States Code, Section 1349, provides that any person who attempts or conspires to commit health care fraud or wire fraud shall be subject to the same penalties as those set forth in 18 U.S.C. §§ 1347 and 1343.

10.     Title 18, United States Code, Section 24(b), defines a "health care benefit program" as, among other things, "any public or private plan . . . affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan."

11.     Title 42, United States Code, Section 1320a-7b(b)(2)(A), prohibits knowingly and willfully offering and paying any remuneration (including any kickback, bribe, or rebate) in return for referring an individual to a person for the furnishing or

arranging of any item or service for which payment may be made in whole or part by Medicare, a federal health care benefits program as defined by 18 U.S.C. § 24(b).

12.     Title 42, United States Code, Section 1320a-7b(b)(1)(A), prohibits knowingly and willfully soliciting and receiving any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or part by Medicare, a federal health benefits program as defined by 18 U.S.C.§ 24(b).

13.     Title 18, United States Code, Section 371, prohibits conspiring to commit any offense against the United States, or to defraud the United States, or any agency thereof.

## THE MEDICARE, MEDICAID, AND BLUE CROSS BLUE SHIELD PROGRAMS

14.     The Medicare Program ("Medicare") is a federally funded health care program providing benefits to persons who are sixty-five years of age or older or disabled.  Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency within the Department of Health and Human Services ("HHS").   Individuals who receive Medicare benefits are Medicare "beneficiaries."

15.     Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24(b).

16.     Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).  Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A.  This investigation involves Medicare Part D, prescription drug benefits.

17.     A pharmacy can participate in Medicare Part D by entering into a retail network agreement directly with a plan or with one or more Pharmacy Benefit Managers ("PBMs").  A PBM acts on behalf of one or more Medicare drug plans. Through a plan's PBM, a pharmacy can join the plan's network.  When a Medicare Part D beneficiary presents a prescription to a pharmacy, the pharmacy submits a claim either directly to the plan or to a PBM that represents the beneficiary's Medicare drug plan.  The plan or PBM determines whether the pharmacy is entitled to payment for each claim and periodically pays the pharmacy for outstanding claims.  The drug plan's sponsor reimburses the PBM for its payments to the pharmacy.  PBMs sometimes contract with Pharmacy Services Administrative Organizations ("PSAOs") to administer some of its services, such as payments.

18.     CVS Caremark, OptumRx, and Express Scripts are three of several PBMs. Each of these PBMs process and adjudicate claims outside the state of Michigan.

19.     Medicare, through CMS, compensates the Medicare drug plan sponsors and pays the sponsors a monthly fee for each Medicare beneficiary of the sponsors'

plans. Such payments are called capitation fees. The capitation fee is adjusted periodically based on various factors, including the beneficiary's medical conditions. In addition, in some cases where a sponsor's expenses for a beneficiary's prescription drugs exceed that beneficiary's capitation fee, Medicare reimburses the sponsor for a portion of those additional expenses.

20.     By becoming a participating provider in Medicare, enrolled providers agree to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies and procedures, rules, and regulations, issued by CMS and its authorized agents and contractors.

21.     Medicare providers are required to maintain all records that disclose the extent of services provided and significant business transactions for a period of at least six years.

22.     Qlarant is the Medicare Part C and Part D program integrity contractor for CMS under the National Benefit Integrity (NBI) Medicare Drug Integrity Contract (MEDIC). The purpose of Qlarant is to detect, prevent, and investigate allegations of fraud, waste, and abuse in the Part C (Medicare Advantage Organizations) and Part D (Prescription Drug Coverage) programs on a national level.

23.    The Michigan Medicaid Program ("Medicaid") is a federal and state funded health care program providing benefits to individuals and families who meet specified financial and other eligibility requirements, and certain other individuals who lack adequate resources to pay for medical care.  CMS is responsible for overseeing the Medicaid program in participating states, including Michigan. Individuals who receive benefits under the Medicaid program are also referred to as "beneficiaries."

24.    Medicaid covers the costs of medical services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled.  Among the specific medical services and products provided by Medicaid are reimbursements to pharmacies for the provision of prescription drugs. Generally, Medicaid covers these costs if, among other requirements, they are medically necessary and ordered by a physician.

25.    Blue Cross and Blue Shield of Michigan ("BCBS") is a nonprofit, privately operated insurance company authorized and licensed to do business in the state of Michigan.  BCBS provides health care benefits, including prescription drug benefits, to member entities and individuals.  Individuals insured by BCBS are referred to as BCBS "members." BCBS has agreements with participating providers, including pharmacies, to furnish medical services to BCBS members.  BCBS is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

10

## SUBJECT PREMISES

### Seaway Pharmacy (Subject Premises 1)

26.     Seaway Pharmacy (Seaway) is a registered business entity with the Michigan Department of Licensing and Regulatory Affairs ("LARA"), Corporations, Securities, and Commercial Licensing Bureau.  Seaway was incorporated on January 16, 2008, by Raad Kouza (Kouza). Kouza was listed as the resident agent and incorporator. On June 15, 2017, a certificate of change of registered office and/or change of resident agent was filed changing the name of the resident agent to Ray Kouza. The most recent annual report filed by Seaway on August 22, 2019, with LARA indicated that Ray Kouza was the President, Treasurer, and Secretary, and that Hani Zaher (Zaher) was the Director. The business address was listed as Subject Premises 1.

27.     During the course of my investigation, I requested records from PBMs and PSAOs.  According to information I obtained through the provider certification from Express Scripts, a PBM that services Seaway, the practice address and remittance address for Seaway were both listed as Subject Premises 1.  Kouza was listed as the owner and contact person for Seaway.  Zaher was listed as the pharmacist-in-charge of Seaway.  Kouza was listed as 50% owner of Seaway and Zaher was listed as the other 50% owner of Seaway.

28.     I have been to Subject Premises 1 on multiple occasions and have verified that

11

Seaway is located at this address. Most recently, I visited Subject Premises 1 on January 16, 2020.

### IRXPLUS.COM, INC./St. Paul Pharmacy (Subject Premises 2)

29.     IRXPLUS.COM, INC. (IRX) is a registered business entity with the Michigan Department of Licensing and Regulatory Affairs ("LARA"), Corporations, Securities, and Commercial Licensing Bureau. IRX was incorporated on January 9, 2001, by Kouza. Kouza was listed as the resident agent and incorporator. On December 14, 2011, a certificate of assumed name was filed for IRX to transact business under the assumed named St. Paul Pharmacy (IRX/St. Paul). The most recent annual report filed by IRX/St. Paul on January 22, 2019, with LARA indicated that R. Kouza was the President, Treasurer, Secretary, and Director.

30.     During the course of my investigation, I requested records from PBMs and PSAOs. According to information I obtained through the provider certification from Express Scripts, a PBM that services IRX/St. Paul, the practice address and remittance address for IRX/St. Paul were both listed as Subject Premises 2. Kouza was listed as the owner and contact person for IRX/St. Paul. Romany Abdelmalak (Abdelmalak) was listed as the pharmacist-in-charge of IRX/St. Paul. Kouza was listed as 100% owner of IRX/St. Paul.

31.     I have been to Subject Premises 2 on multiple occasions and have verified that IRX/St. Paul is located at this address. Most recently, I visited Subject Premises 2

on January 16, 2020.

## NRK RX, Inc./Food Town Drugs (Subject Premises 3)

32.    NRK RX, INC. (NRK) is a registered business entity with the Michigan Department of Licensing and Regulatory Affairs ("LARA"), Corporations, Securities, and Commercial Licensing Bureau.  NRK was incorporated on June 24, 2003, by Kouza. Kouza was listed as the resident agent and incorporator and the address of the registered office was listed as Subject Premises 3. On August 5, 2003, a certificate of assumed name was filed for NRK to transact business under the assumed named FOOD TOWN DRUGS (NRK/Food Town).  The most recent annual report filed by NRK/Food Town on January 22, 2019, with LARA indicated that R. Kouza was the President, Treasurer, Secretary, and Director.

33.    During the course of my investigation, I requested records from PBMs and PSAOs.  According to information I obtained through the provider certification from Express Scripts, a PBM that services NRK/Food Town, the practice address and remittance address for NRK/Food Town were both listed as Subject Premises 3. Kouza was listed as the 100% owner of NRK/Food Town. Tammy Berry was listed at the pharmacist-in-charge of NRK/Food Town.

34.    I have been to Subject Premises 3 on multiple occasions and have verified NRK/Food Town is located at this address.  Most recently, I visited Subject Premises 3 on January 16, 2020.

13

## Rockwood Pharmacy P.C. (Subject Premises 4)

35.     Rockwood Pharmacy P.C. (Rockwood) is a registered business entity with the Michigan Department of Licensing and Regulatory Affairs ("LARA"), Corporations, Securities, and Commercial Licensing Bureau. Rockwood was incorporated on January 16, 2008, by Kouza. Kouza was listed as the resident agent and incorporator and the address of the registered office was listed as Subject Premises 4. The most recent annual report filed by Rockwood on January 22, 2019, with LARA indicated that R. Kouza was the President, Treasurer, Secretary, and Director.

36.     During the course of my investigation, I requested records from PBMs and PSAOs. According to information I obtained through the provider certification from Express Scripts, a PBM that services Rockwood, the practice address and remittance address for Rockwood were both listed as Subject Premises 4. Kouza was listed as the 100% owner of Rockwood. Runnan Shen (Shen) was listed at the pharmacist-in-charge of Rockwood.

37.     I have been to Subject Premises 4 on multiple occasions and have verified Rockwood is located at this address. Most recently, I visited Subject Premises 4 on January 16, 2020.

## Colosseum Inc./ER Drugs (Subject Premises 5)

38.     Colosseum Inc. (Colosseum) is a registered business entity with the Michigan

14

Department of Licensing and Regulatory Affairs ("LARA"), Corporations, Securities, and Commercial Licensing Bureau. Colosseum was incorporated on January 4, 2002, by Kouza. Kouza was listed as the resident agent and incorporator. On January 25, 2002, a certificate of assumed name was filed for Colosseum to transact business under the assumed named ER Drugs (Colosseum/ER Drugs). The most recent annual report filed by Colosseum/ER Drugs on January 22, 2019, with LARA indicated that R. Kouza was the President, Treasurer, Secretary, and Director.

39.    During the course of my investigation, I requested records from PBMs and PSAOs. According to information I obtained through the provider certification from Express Scripts, a PBM that services Colosseum/ER Drugs, the practice address for Colosseum/ER Drugs was Subject Premises 5. Kouza was listed as the owner of Rockwood and "Raad" was listed as the contact person. Ramis Kouza (Ramis) was listed as an individual authorized to sign on the owner's behalf. Hiam George (George) was listed at the pharmacist-in-charge of Colosseum/ER Drugs and Prasenjit Das was listed as a pharmacist at Colosseum/ER Drugs.

40.    I have been to Subject Premises 5 on multiple occasions and have verified that Colosseum/ER Drugs is located at this address. Most recently, I visited Subject Premises 5 on January 16, 2020.

### Zaher's Residence (Subject Premises 6)

41.    According to Michigan Secretary of State records for driver's licenses,

15

Zaher's current address is listed as 625 Brentwood Drive, Dearborn, Michigan 48124 (Subject Premises 6).  A public records search through Clear also indicated Zaher's current address was Subject Premises 6.

## FRAUD SCHEME

42.    Kouza and his co-conspirators, while owning and operating Seaway, IRX/St. Paul, NRK/Food Town, Rockwood, and Colosseum/ER Drugs, fraudulently billed Medicare and Medicaid for expensive medications that were not dispensed to beneficiaries.  Seaway, IRX/St. Paul, NRK/Food Town, Rockwood, and Colosseum/ER Drugs did not have sufficient drug inventory to dispense numerous expensive medications billed to Medicare and Medicaid.   In addition, Seaway, IRX/St. Paul, NRK/Food Town, Rockwood, and Colosseum/ER Drugs submitted claims to Medicare for beneficiaries who were deceased on the dates that the prescriptions were purportedly disbursed.   Based on this shortage, Qlarant, the Medicare Drug Integrity Contractor (MEDIC), conducted an inventory reconciliation analysis for the above-referenced pharmacies.    In total, Qlarant concluded that Medicare and Medicaid overpaid these pharmacies approximately $9,404,645,20 from 2010 through July 2016.  In addition, BCBS overpaid these pharmacies approximately $1,214,097.27 for the shortage drugs during this period.

43.    As stated below, each of the above-referenced pharmacies continued to submit claims to Medicare from the end of Qlarant's reconciliation period in 2016 through at

least October 2019.  Each of these pharmacies continued to engage in a pattern of billing Medicare for high-reimbursement drugs from 2017 onward.

44.    Kouza and his co-conspirators submitted and caused the submission of false and fraudulent claims, through interstate wires from Michigan, to Medicare and Medicaid.  The claims were processed and adjudicated electronically by CVS Caremark, OptumRx, and Express Scripts, among other PBMs, outside the state of Michigan.

## PROBABLE CAUSE FOR SUBJECT PREMISES

### Seaway Pharmacy (Subject Premises 1)

### Qlarant Invoice Reconciliation for Subject Premises 1

45.    In 2016, the Michigan Department of Health and Human Services, Office of Inspector General ("MDHHS-OIG") conducted an invoice review of Seaway for the period January 1, 2010, through July 31, 2016.  MDHHS-OIG's invoice review compared Seaway's drug purchases to its Medicaid billing for this period.  MDHHS-OIG provided me with Seaway's drug purchase records utilized in its invoice review of Seaway for the above-stated period.  During the MDHHS-OIG invoice review, the MDHHS-OIG verified the pharmaceutical wholesalers used by Seaway.

46.    The records provided by MDHHS-OIG contained drug sale or purchase records from pharmaceutical wholesalers Amerisource Bergen, Anda, Auburn Pharmaceutical, Cardinal Health (ParMed), Harvard Drug Group, Intermed, Masters

Pharmaceutical, Prescription Supply, Richie Pharmacal, and Top RX.

47.    I furnished all of the wholesaler records I received to Qlarant and requested an invoice review for the period of January 5, 2010, through July 29, 2016.  Qlarant compared invoices for Seaway's drug purchases to both Medicare and Medicaid claims data for this period.

48.    On August 23, 2018, Qlarant finalized its invoice review of Seaway and concluded the following:

**Date Range of Invoice Review:** 1/5/2010 – 07/29/2016

**Number of Drugs Reviewed:** 115

**Total number of drugs short to Medicare:** 54

**Total number of drugs short to Medicaid:** 17

**Approximate Dollar Loss according to Medicare:** $1,308,845.49

**Approximate Dollar Loss according to Medicaid:** $301,290.51

**Approximate Dollar Loss according to Medicare and Medicaid Combined:** $1,610,136.00.

49.    Qlarant provided the following summary of Seaway's top 10 drug shortages by approximate dollar loss to Medicare and Medicaid combined:

| Drug Name | Approx. Dollar Loss |
|---|---|
| Abilify Tab 30mg | $137,343.00 |
| Spiriva Cap Handihlr | $137,155.92 |
| Seroquel XR Tab 400mg | $118,799.10 |
| Abilify Tab 20mg | $116,558.91 |

18

| Drug Name | Approx. Dollar Loss |
|---|---|
| Zyprexa Tab 20mg | $113,839.55 |
| Lantus Inj 100/ml | $95,088.84 |
| Seroquel XR Tab 300mg | $80,294.91 |
| Advair Disku Aer 250/50 | $68,223.67 |
| Seroquel Tab 300mg | $61,470.98 |
| Rebif Inj 44/0.5 | $51,844.94 |

50.     In sum, Qlarant concluded that Seaway's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least 54 of the 115 drugs selected for the analysis.  Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid Seaway approximately $1,610,136.00 for medications that Seaway did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Abilify, Seroquel, Spiriva Cap Handihlr, and Zyprexa.

51.     Seaway continued to submit claims to Medicare in 2017, 2018, and 2019. Advair and Spiriva remained among the highest-billed prescriptions at Seaway during this period.  The last known date that Seaway submitted claims to Medicare was in October 2019.

52.     On May 9, 2018, LARA's Bureau of Professional Licensing served Seaway with an Administrative Complaint and an Order of Summary Suspension and for Seizure of Controlled Substances.   Specifically, the order suspended Seaway's controlled substance license.

19

53.   On July 29, 2019, MDHHS entered an administrative order based on MDHHS-OIG's audit in which it found that MDHHS overpaid Seaway $505,080.26 in Medicaid reimbursements from January 1, 2010 through July 31, 2016.

### Blue Cross Blue Shield Shortage for Subject Premises 1

54.   Based on the shortage to Medicare and Medicaid, Blue Cross Blue Shield performed an analysis to determine how the shortage affected overpayments by Blue Cross Blue Shield to Seaway.

55.   On September 28, 2018, Blue Cross Blue Shield provided a financial impact letter in which it determined that Blue Cross Blue Shield paid a total of $279,134.73 in claims submitted by Seaway from January 5, 2010 through July 29, 2016 that indicated a shortage of pharmaceutical drugs being supplied.

### Billing for Deceased Beneficiaries at Subject Premises 1

56.   I conducted a review of the Medicare Part D claims data and Medicaid claims data for Seaway, which revealed that Seaway billed for medication purportedly dispensed to beneficiaries after they were deceased. Between November 2010 and May 2018, Seaway submitted 112 claims for medications purportedly dispensed to 23 beneficiaries after their dates of death.

### Beneficiary Interview for Subject Premises 1

57.   On April 19, 2019, I interviewed Medicare beneficiary T.T., who said that s/he filled his/her prescriptions at Seaway and positively identified Zaher as the

pharmacist at Seaway. S/he stated that s/he knew Zaher by the name "Henry." Agents showed T.T. records related to his/her inhaler prescriptions. Specifically, T.T. was shown records indicating that Seaway billed Medicare for 50 inhalers for T.T. from September 2012 to September 2017, six of which were Breo inhalers. T.T. stated that s/he never received 50 inhalers from Seaway, and that s/he received only three Breo inhalers from Seaway. T.T stated that s/he kept every Breo inhaler that s/he had ever received from Seaway, and showed Interviewing Agents the three Breo inhalers that s/he had received in total from Seaway. Despite Medicare data indicating that s/he received a Breo inhaler in September 2017, T.T. stated that s/he did not receive any Breo inhalers after August 2017.

## IRX/St. Paul (Subject Premises 2)

## Qlarant Invoice Reconciliation for Subject Premises 2

58.     In 2016, the Michigan Department of Health and Human Services, Office of Inspector General ("MDHHS-OIG") conducted an invoice review of IRX/St. Paul for the period August 1, 2012, through May 31, 2016. MDHHS-OIG's invoice review compared IRX/St. Paul's drug purchases to its Medicaid billing for this period. MDHHS-OIG provided me with IRX's drug purchase records utilized in its invoice review of IRX/St. Paul for the above-stated period. During the MDHHS-OIG invoice review, the MDHHS-OIG verified the pharmaceutical wholesalers used by IRX/St. Paul.

59.   The records provided by MDHHS-OIG contained drug sale or purchase records from pharmaceutical wholesalers Anda (VIP), Auburn Pharmaceuticals, Cardinal Health (Harvard), Cardinal Health (ParMed), Intermed, Masters Pharmaceutical, Matrix Distributors, McKesson, Prescription Supply, and Top Rx.

60.   I furnished all of the wholesaler records I received to Qlarant and requested an invoice review for the period of August 2, 2012, through May 31, 2016.  Qlarant compared invoices for IRX's drug purchases to both Medicare and Medicaid claims data for this period.

61.   On August 23, 2018, Qlarant finalized its invoice review of IRX/St. Paul and concluded the following:

> **Date Range of Invoice Review:** 8/2/2012 – 05/31/2016
>
> **Number of Drugs Reviewed:** 68
>
> **Total number of drugs short to Medicare:** 57
>
> **Total number of drugs short to Medicaid:** 24
>
> **Approximate Dollar Loss according to Medicare:** $1,579,913.58
>
> **Approximate Dollar Loss according to Medicaid:** $679,418.87
>
> **Approximate Dollar Loss according to Medicare and Medicaid Combined:** $2,259,332.44.

62.   Qlarant provided the following summary of IRX/St. Paul's top 10 drug shortages by approximate dollar loss to Medicare and Medicaid combined:

| Drug Name | Approx. Dollar Loss |
|---|---|
| Lidocaine Oin 5% | $244,213.07 |
| Spiriva Cap Handihlr | $227,715.25 |
| Gleevec Tab 100mg | $121,149.66 |
| Seroquel XR Tab 200mg | $118,543.02 |
| QVAR Aer 80mcg | $117,742.72 |
| Seroquel XR Tab 300mg | $114,327.96 |
| Atrovent HFA Aer 17 mcg | $98,589.40 |
| Symbicort Aer 160-4.5 | $80,594.95 |
| Advair Disku Aer 250/50 | $74,642.09 |
| Lidoderm Dis 5% | $73,771.95 |

63.     In sum, Qlarant concluded that IRX/St. Paul's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least 57 of the 68 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid IRX/St. Paul approximately $2,259,332.44 for medications that IRX/St. Paul did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Lidocaine Oin 5%, Gleevec Tab 100mg, Spiriva Can Handihlr, and Seroquel.

64.     IRX/St. Paul continued to submit claims to Medicare in 2017, 2018, 2019, and 2020.   Advair, Spiriva, and Symbicort remained among the highest-billed prescriptions at IRX/St. Paul during this period.  The last known date that IRX/St. Paul submitted claims to Medicare was in January 2020.

65.     On July 29, 2019, MDHHS entered an administrative order based on MDHHS-OIG's audit in which it found that MDHHS overpaid IRX/St. Paul

$734,647.03 in Medicaid reimbursements from August 1, 2012 through May 31, 2016.

### Blue Cross Blue Shield Shortage for Subject Premises 2

66.    Based on the shortage to Medicare and Medicaid, Blue Cross Blue Shield performed an analysis to determine how the shortage affected overpayments by Blue Cross Blue Shield to IRX/St. Paul.

67.    On September 28, 2018, Blue Cross Blue Shield provided a financial impact letter where a determination was made that Blue Cross Blue Shield paid a total of $179,012.11 in claims submitted by IRX/St. Paul from August 2, 2012 to May 31, 2016 that indicated a shortage of pharmaceutical drugs being supplied.

### Billing for Deceased Beneficiaries at Subject Premises 2

68.    I conducted a review of the Medicare Part D claims data and Medicaid claims data for IRX/St. Paul, which revealed that IRX/St. Paul billed for medication purportedly dispensed to beneficiaries after they were deceased. Between August 2012 and May 2018, IRX/St. Paul submitted 174 claims for medications purportedly dispensed to 35 beneficiaries after their dates of death.

### Beneficiary Interview from Subject Premises 2

69.    On April 16, 2019, I interviewed Medicare beneficiary D.H., who stated that s/he filled his/her prescriptions at IRX/St. Paul Pharmacy and positively identified Abdelmalak as the pharmacist that filled his/her prescriptions at IRX/St. Paul.

24

Agents showed D.H. records related to his/her inhaler prescriptions.  Specifically, D.H. was shown records indicating that IRX/St. Paul billed Medicare for 17 Atrovent inhalers, 19 Symbicort inhalers, and two Spiriva inhalers between March 2014 and August 2015.  D.H. stated that the only inhalers that s/he used were Albuterol and Proair and that s/he never received Atrovent or Symbicort inhalers.

### NRK/Food Town (Subject Premises 3)

### Qlarant Invoice Reconciliation for Subject Premises 3

70.    In 2016, the Michigan Department of Health and Human Services, Office of Inspector General ("MDHHS-OIG") conducted an invoice review of NRK/Food Town for the period January 1, 2011, through July 31, 2016.  MDHHS-OIG's invoice review compared NRK/Food Town's drug purchases to its Medicaid billing for this period.  MDHHS-OIG provided me with NRK/Food Town's drug purchase records utilized in its invoice review of NRK/Food Town for the above-stated period. During the MDHHS-OIG invoice review, the MDHHS-OIG verified the pharmaceutical wholesalers used by NRK/Food Town.

71.    The records provided by MDHHS-OIG contained drug sale or purchase records from pharmaceutical wholesalers Amerisource Bergen, Anda (VIP), Auburn Pharmaceutical, Cardinal Health (Harvard), Cardinal Health (ParMed), Intermed, Masters Pharmaceutical, Matrix Distributors, Prescription Supply, Richie Pharmacal, Smart Fill, and Top Rx.

72.     I furnished all of the wholesaler records I received to Qlarant and requested an invoice review for the period of January 2, 2011, through July 29, 2016.  Qlarant compared invoices for NRK's drug purchases to both Medicare and Medicaid claims data for this period.

73.     On August 20, 2018, Qlarant finalized its invoice review of NRK/Food Town and concluded the following:

**Date Range of Invoice Review:** 1/2/2011 – 07/29/2016

**Number of Drugs Reviewed:** 102

**Total number of drugs short to Medicare:** 58

**Total number of drugs short to Medicaid:** 18

**Approximate Dollar Loss according to Medicare:** $1,462,720.68

**Approximate Dollar Loss according to Medicaid:** $325,576.66

**Approximate Dollar Loss according to Medicare and Medicaid Combined:** $1,788,297.34.

74.     Qlarant provided the following summary of NRK/Food Town's top 10 drug shortages by approximate dollar loss to Medicare and Medicaid combined:

| Drug Name | Approx. Dollar Loss |
|---|---|
| Abilify Tab 30mg | $220,394.99 |
| Abilify Tab 20mg | $167,179.48 |
| Abilify Tab 10mg | $138,972.08 |
| Seroquel XR Tab 300mg | $133,990.15 |
| Lamotrigine Tab 200mg er | $79,744.40 |
| Seroquel XR Tab 400mg | $77,705.75 |

| Drug Name | Approx. Dollar Loss |
|---|---|
| Seroquel Tab 200mg | $77,355.42 |
| Abilify Tab 5mg | $74,560.27 |
| Seroquel Tab 300mg | $56,071.91 |
| Abilify Tab 2mg | $48,504.79 |

75.   In sum, Qlarant concluded that NRK/Food Town's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least 58 of the 102 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid NRK/Food Town approximately $1,788,297.34 for medications that NRK/Food Town did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Abilify, Seroquel, and Lamotrigine.

76.   NRK/Food Town continued to submit claims to Medicare in 2017, 2018, 2019, and 2020.  Among the highest billed prescriptions at NRK/Food Town during this period were high-reimbursement drugs including Latuda and Lyrica.  The last known date that NRK/Food Town submitted claims to Medicare was in January 2020.

77.   On July 29, 2019, MDHHS entered an administrative order based on MDHHS-OIG's audit in which it found that MDHHS overpaid NRK/Food Town $541,590.71 in Medicaid reimbursements from January 1, 2011 through July 31, 2016.

**Blue Cross Blue Shield Shortage at Subject Premises 3**

78.    Based on the shortage to Medicare and Medicaid, Blue Cross Blue Shield performed an analysis to determine how the shortage affected overpayments by Blue Cross Blue Shield to NRK/Food Town.

79.    On September 28, 2018, Blue Cross Blue Shield provided a financial impact letter where a determination was made that Blue Cross Blue Shield paid a total of $217,394.42 in claims submitted by NRK/Food Town from January 1, 2011 through July 29, 2016 that indicated a shortage of pharmaceutical drugs being supplied.

**Billing for Deceased Beneficiaries at Subject Premises 3**

80.    I conducted a review of the Medicare Part D claims data and Medicaid claims data for NRK/Food Town, which revealed that NRK/Food Town billed for medication purportedly dispensed to beneficiaries after they were deceased. Between October 2011 and May 2017, NRK/Food Town submitted 22 claims for medications purportedly dispensed to four beneficiaries after their dates of death.

**Beneficiary Interview for Subject Premises 3**

81.    On May 3, 2019, I interviewed Medicare beneficiary N.S., who stated that s/he filled his/her prescriptions at NRK/Food Town and positively identified Berry as the pharmacist at NRK/Food Town.   Agents showed N.S. records related to his/her Latuda prescription.   Specifically, N.S. was shown records indicating that NRK/Food Town had billed Medicare for 14 Latuda prescriptions in 2015.   N.S.

28

stated that s/he did not receive 14 Latuda prescriptions from NRK/Food Town in 2015, and that s/he received one prescription per month for a total of 12 prescriptions that year. Agents showed N.S. records indicating that Food Town had billed Medicare for seven Latuda pills for N.S. on February 9, 2015. N.S. stated that s/he never received a prescription for seven Latuda pills on that date. Finally, N.S. was shown records indicating that NRK/Food Town had billed Medicare for a 62-count fill of Latuda on June 15, 2014. N.S. stated that s/he never received a 62-count fill of Latuda from NRK/Food Town on that date, and that s/he only received 30-count fills of Latuda from NRK/Food Town.

## Rockwood Pharmacy (Subject Premises 4)

## Qlarant Invoice Reconciliation for Subject Premises 4

82. In 2016, the Michigan Department of Health and Human Services, Office of Inspector General ("MDHHS-OIG") conducted an invoice review of Rockwood for the period January 1, 2011, through July 31, 2016. MDHHS-OIG's invoice review compared Rockwood's drug purchases to its Medicaid billing for this period. MDHHS-OIG provided me with Rockwood's drug purchase records utilized in its invoice review of Rockwood for the above-stated period. During the MDHHS-OIG invoice review, the MDHHS-OIG verified the pharmaceutical wholesalers used by Rockwood.

83. The records provided by MDHHS-OIG contained drug sale or purchase

records from pharmaceutical wholesalers Amerisource Bergen, Anda (VIP), Auburn Pharmaceutical, Cardinal Health (Harvard), Cardinal Health (ParMed), Global Pharmaceutical, Intermed, Matrix Distributors, Prescription Supply, and Top Rx.

84.    I furnished all of the wholesaler records I received to Qlarant and requested an invoice review for the period of January 2, 2011, through July 29, 2016.  Qlarant compared invoices for Rockwood's drug purchases to both Medicare and Medicaid claims data for this period.

85.    On August 22, 2018, Qlarant finalized its invoice review of Rockwood and concluded the following:

> **Date Range of Invoice Review:** 1/2/2011 – 07/29/2016
>
> **Number of Drugs Reviewed:** 122
>
> **Total number of drugs short to Medicare:** 57
>
> **Total number of drugs short to Medicaid:** 10
>
> **Approximate Dollar Loss according to Medicare:** $522,678.16
>
> **Approximate Dollar Loss according to Medicaid:** $23,375.84
>
> **Approximate Dollar Loss according to Medicare and Medicaid Combined:** $546,054.00.

86.    Qlarant provided the following summary of Rockwood's top 10 drug shortages by approximate dollar loss to Medicare and Medicaid combined:

| Drug Name | Approx. Dollar Loss |
|---|---|
| Spiriva Cap Handihlr | $105,781.13 |

30

| Drug Name | Approx. Dollar Loss |
|---|---|
| Lidoderm Dis 5% | $60,649.74 |
| Advair Disku Aer 250/50 | $51,391.35 |
| Advair Disku Aer 500/50 | $35,111.32 |
| Abilify Tab 5mg | $20,944.78 |
| Seroquel XR Tab 300mg | $20,885.61 |
| Januvia Tab 100mg | $20,137.15 |
| Seroquel Tab 300mg | $17,896.99 |
| Welchol Tab 625mg | $17,657.63 |
| Cymbalta Cap 60mg | $16,239.26 |

87.    In sum, Qlarant concluded that Rockwood's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least 57 of the 122 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid Rockwood approximately $546,054.00 for medications that Rockwood did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Spiriva Cap Handihlr, Lidoderm Dis 5%, and Advair Disku.

88.    Rockwood continued to submit claims to Medicare in 2017, 2018, 2019, and 2020.  Advair remained among the highest-billed prescriptions at Rockwood during this period.  The last known date that Rockwood submitted claims Medicare was in January 2020.

89.    On April 24, 2019, the MDHHS entered an administrative order based on MDHHS-OIG's audit in which it found that MDHHS overpaid Rockwood $144,381.69 in Medicaid reimbursements from January 1, 2010 through July 31,

2016.

### Blue Cross Blue Shield Shortage for Subject Premises 4

90.     Based on the shortage to Medicare and Medicaid, Blue Cross Blue Shield performed an analysis to determine how the shortage affected overpayments by Blue Cross Blue Shield to Rockwood.

91.     On September 28, 2018, Blue Cross Blue Shield provided a financial impact letter where a determination was made that Blue Cross Blue Shield paid a total of $233,978.33 in claims submitted by Rockwood from January 2, 2011 through July 29, 2016 that indicated a shortage of pharmaceutical drugs being supplied.

### Billing for Deceased Beneficiaries at Subject Premises 4

92.     I conducted a review of the Medicare Part D claims data and Medicaid claims data for Rockwood, which revealed that Rockwood billed for medication purportedly dispensed to beneficiaries after they were deceased. Between May 2012 and June 2015, Rockwood submitted two claims for medications purportedly dispensed to two beneficiaries after their dates of death.

### Beneficiary Interview for Subject Premises 4

93.     On April 26, 2019, I interviewed Medicare beneficiary R.C., who stated that s/he filled his/her prescriptions at Rockwood and positively identified Shen as the pharmacist at Rockwood.   R.C. was shown records related to his/her Zenpep prescription.   R.C. stated that s/he knew that s/he was the only patient at Rockwood

who received Zenpep, and that s/he solely received it in 100-count fills.  S/he stated that although Zenpep was prescribed to him/her on a monthly basis, s/he sometimes did not refill his/her prescription for several months. Agents showed R.C. data indicating that Rockwood had billed Medicare for 240-count prescriptions of Zenpep for R.C. every month from July 2014 to December 2014.  R.C. stated that s/he never received a 240-count fill of Zenpep from Rockwood, and stated that such an amount would equate to him/her taking up to eight pills a day.

**Colosseum/ER Drugs (Subject Premises 5)**

**Qlarant Invoice Reconciliation for Subject Premises 5**

94.    In 2016, the Michigan Department of Health and Human Services, Office of Inspector General ("MDHHS-OIG") conducted an invoice review of Colosseum/ER Drugs for the period January 1, 2010, through July 31, 2016.  MDHHS-OIG's invoice review compared Colosseum/ER Drugs' drug purchases to its Medicaid billing for this period.  MDHHS-OIG provided me with Colosseum/ER Drugs' drug purchase records utilized in its invoice review of Colosseum for the above-stated period.  During the MDHHS-OIG invoice review, the MDHHS-OIG verified the pharmaceutical wholesalers used by Colosseum/ER Drugs.

95.    The records provided by MDHHS-OIG contained drug sale or purchase records from pharmaceutical wholesalers Amerisource Bergen, Anda (VIP), Auburn Pharmaceutical, Cardinal Health (Harvard), Cardinal Health (ParMed), H&H

33

Wholesale, Intermed, Masters Pharmaceutical (River City), Matrix Distributors, Prescription Supply, Smart Fill, and Top Rx.

96.     I furnished all of the wholesaler records I received to Qlarant and requested an invoice review for the period of January 4, 2010, through July 29, 2016.  Qlarant compared invoices for Colosseum's drug purchases to both Medicare and Medicaid claims data for this period.

97.     On August 14, 2018, Qlarant finalized its invoice review of Colosseum/ER Drugs and concluded the following:

> **Date Range of Invoice Review:** 1/4/2010 – 07/29/2016
>
> **Number of Drugs Reviewed:** 135
>
> **Total number of drugs short to Medicare:** 99
>
> **Total number of drugs short to Medicaid:** 28
>
> **Approximate Dollar Loss according to Medicare:** $2,496,486.02
>
> **Approximate Dollar Loss according to Medicaid:** $709,338.60
>
> **Approximate Dollar Loss according to Medicare and Medicaid Combined:** $3,205,824.62.

98.     Qlarant provided the following summary of Colosseum/ER Drugs' top 10 drug shortages by approximate dollar loss to Medicare and Medicaid combined:

| Drug Name | Approx. Dollar Loss |
|-----------|---------------------|
| Abilify Tab 30mg | $318,296.23 |
| Zyprexa Tab 20mg | $214,949.75 |

| Drug Name | Approx. Dollar Loss |
|---|---|
| Spiriva Cap Handihlr | $183,502.75 |
| Abilify Tab 15mg | $173,348.97 |
| Advair Disku Aer 250/50 | $140,367.93 |
| Abilify Tab 10mg | $134,805.59 |
| Enbrel Srclk Inj 50mg/ml | $108,350.18 |
| Seroquel Tab 300mg | $99,588.22 |
| Seroquel XR Tab 300 mg | $94,490.41 |
| Abilify Tab 20mg | $92,208.69 |

99.   In sum, Qlarant concluded that Colosseum/ER Drugs' inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least 99 of the 135 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid Colosseum/ER Drugs approximately $3,205,824.62 for medications that Colosseum/ER Drugs did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Abilify, Spiriva Cap Handhlr, Zyprexa, and Advair Disku.

100.   Colosseum/ER Drugs continued to submit claims to Medicare in 2017, 2018, 2019, and 2020.  Advair and Spiriva remained among the highest-billed prescriptions at Colosseum/ER Drugs during this period.  The last known date that Colosseum/ER Drugs submitted claims to Medicare was in January 2020.

101.   On August 15, 2019, MDHHS entered an administrative order based on MDHHS-OIG's audit in which it found that MDHHS overpaid Colosseum/ER Drugs

$1,205,426.23 in Medicaid reimbursements from January 1, 2010 through July 31, 2016.

### Blue Cross Blue Shield Shortage for Subject Premises 5

102.  Based on the shortage to Medicare and Medicaid, Blue Cross Blue Shield performed an analysis to determine how the shortage affected overpayments by Blue Cross Blue Shield to Colosseum/ER Drugs.

103.  On September 28, 2018, Blue Cross Blue Shield provided a financial impact letter where a determination was made that Blue Cross Blue Shield paid a total of $304,577.68 in claims submitted by Colosseum/ER Drugs from January 4, 2010 through July 29, 2016 that indicated a shortage of pharmaceutical drugs being supplied.

### Billing for Deceased Beneficiaries at Subject Premises 5

104.  I conducted a review of the Medicare Part D claims data and Medicaid claims data for Colosseum/ER Drugs, which revealed that Colosseum/ER Drugs billed for medication purportedly dispensed to beneficiaries after they were deceased. Between August 2010 and May 2018, Colosseum/ER Drugs submitted 20 claims for medications purportedly dispensed to eight beneficiaries after their dates of death.

### Beneficiary Interview for Subject Premises 5

105.  On April 19, 2019, I interviewed Medicare beneficiary D.D., who stated that s/he filled his/her prescriptions at Colosseum/ER Drugs and positively identified

36

Prasenjit Das as the pharmacist at Colosseum/ER Drugs.   Agents showed D.D. records related to his/her inhaler prescriptions.   Specifically, s/he was shown records indicating that Colosseum/ER Drugs had billed Medicare for 102 inhalers for D.D. between October 2010 and July 2018, and that Colosseum/ER Drugs had billed for multiple brands of inhalers within overlapping timeframes.   D.D. stated that s/he did not receive 102 inhalers from Colosseum/ER Drugs.   Agents showed D.D. data indicating that Colosseum/ER Drugs dispensed Spiriva to D.D. on September 24, 2015, which was a 30-day supply and then dispensed Advair to D.D. on October 1, 2015, which was a 90-day supply.   D.D. stated that s/he never used Advair and Spiriva at the same time.

### Trash Pulls at Zaher's Residence (Subject Premises 6)

106.   On November 20, 2019, I conducted a trash pull at Subject Premises 6, which revealed the following:

- An envelope from P.C. addressed to Seaway Pharmacy, 8750 Telegraph Road, Suite 104, Taylor, Michigan 48180 (Subject Premises 6).   I reviewed Seaway Pharmacy's Medicare and Medicaid data and discovered that P.C. is a Medicare beneficiary who refilled his/her prescriptions at Seaway Pharmacy from June 2016 through at least June 2018.

- A torn envelope from SRS Pharmacy Systems, 319 N. State St., Caro, MI, 48723.   Based on my training and experience, I know that SRS Pharmacy

37

Systems is a pharmacy software vendor. According to information I obtained through the provider certification from Express Scripts, a PBM that services Seaway, SRS is the listed software vendor for Seaway.

- A torn-in-half envelope from GRx, 100 Collin Drive, Holbrook, NY 11741. Based on my training and experience, I know that GRx is a pharmaceutical wholesaler that also accepts returned medication. On December 5, 2019, agents interviewed Toni Ann Meadows, Senior Vice President of Service for GRx, who stated that Seaway was a customer that transacted business with GRx, and that their last business transaction with Seaway was on January 28, 2019. GRx also transacted business with Seaway in 2017 and 2018. Meadows stated that an individual named Henry was GRx's point-of-contact for Seaway.

107. On January 15, 2020, I conducted a trash pull at Subject Premises 6, which revealed the following:

- A torn envelope from SRS Pharmacy Systems, 319 N. State St. Caro, MI, 48723. As stated above, I know that SRS Pharmacy Systems is a software vendor for Seaway.

108. On January 22, 2020, I conducted a trash pull at Subject Premises 6, which revealed the following:

- A Reliant Funding document addressed to RAAD KOUZA, SEAWAY

38

PHARMACY PC, 8750 TELEGRAPH RD STE 104, TAYLOR, MI 48180-2398. The letter reads, "Your New Reliant Premier Line Card," and states that Seaway is eligible for a "Business Cash" account with a credit line up to $250,000.

- A torn-in-half envelope from PH VENTURES addressed to RICK KOUZA, SEAWAY PHARMACY PC, 8750 TELEGRAPH RD STE 104, TAYLOR, MI 48180-2398 and a torn-in-half letter from PH VENTURES. The letter, dated January 10, 2020, states that PH VENTURES assists with the sale of retail pharmacies and that it operates to "represent the pharmacy owner's best interest while helping to guide them through the process so they can focus on and continue to run and grow their pharmacy business."

109. Based on my training and experience, and corroborated by the trash pulls of November 20, 2019, January 15, 2020, and January 22, 2020, I believe that Zaher, as the 50% owner and pharmacist-in-charge of Seaway, conducts business for Seaway from his residence—Subject Premises 6. Accordingly, there is probable cause to believe that documents and other records associated with Seaway will be located at Subject Premises 6.

## REQUEST TO SEIZE COMPUTERS AND COMPUTER RECORDS

110. It has been your Affiant's experience and training that, generally, business offices rely upon computers to create and store data, including billing data. It is

likely that the providers' insurance billing and patient records, documents, and materials will be found stored on computers in their respective offices.

111.   For the reasons stated above, there is probable cause to believe that one or more computers at Subject Premises 1-5 were used to generate false billings and contain information including records, documents, and materials relating to these crimes.

112.   Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (computer personnel) will access any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data.  If computer personnel determine that these items cannot be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, the agents will seize the computer equipment and storage devices for the purposes of conducting an off-site search, consistent with Federal Rule of Criminal Procedure 41(e)(2)(B).

113.   If the computer personnel determine that the data reviewed does not fall within any of the items to be seized pursuant to this warrant or is not otherwise legally seized, the government will return these items within a reasonable period of time from the date of seizure unless further authorization is obtained from the court.

114.   Authority is sought to search any computer related equipment capable of

creating and/or storing information in electronic or magnetic form for the items listed in Attachment B.  "Computer related equipment" refers to:

- Computer hardware, consisting of all equipment that can collect, analyze,  create, display, convert, store, conceal, or transmit electronic, magnetic, optical,  or similar computer impulses or data. Hardware includes, but is not limited to,  any data-processing devices (such as central processing units, memory typewriters, self-contained "laptop" or "notebook" computers, "palm pilots" or personal data assistants, "tablet" computing devices, smartphones, iPods or  other similar media devices, memory facsimile machines, and "schedulers");  internal and peripheral storage devices (such as fixed disks, external hard drives, floppy disk drives and diskettes, USB storage devices, optical storage devices, transistor-like binary devices, read/write CD and DVD devices, and any and all storage devices); peripheral input/output devices (such as keyboards, printers, scanners, video display monitors, mouse devices); and related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units); as well as any devices,  mechanisms, or parts that can be used to restrict access to computer hardware  (such as physical keys and locks);

- Computer software, that is, digital information that can be interpreted

by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word processing, networking, graphics, accounting, presentations or spreadsheet programs), utilities, compilers, interpreters, and communications programs;

- Computer passwords and other data security devices, that is, a string of alphanumeric characters designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programmable code. A password usually operates as a sort of digital key to "unlock" particular storage data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, destroy or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it;

- Related communication devices, such as modems, facsimile machines, telephone equipment with built-in memory devices, and answering

machines, together with system documentation, operating logs and documentation, software and instruction manuals.

115. If occupants of the premises are unwilling to cooperate with the agent(s) regarding the operation of an on-site computer system(s), and/or it appears that there is/are data security devices involved, or the computer system(s) utilizes unusual or proprietary equipment, the computer system may be seized, along with the proprietary equipment.

116. Based on the foregoing, and consistent with Rule 41(e) (2) (B), when persons executing the warrant conclude that it would be impractical to review the media on-site, authority is sought to seize or image storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to computer assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## SPECIAL INSTRUCTIONS REGARDING REVIEW OF SEIZED MATERIALS

117. With respect to law enforcement's review of the seized material identified in Attachment B, law enforcement (i.e., the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and

43

contractors whom law enforcement deems necessary to assist in the review of the seized material (collectively, the "Review Team") are hereby authorized to review, in the first instance, the seized material.

118.   If, during the review of the seized material, the review team finds potentially privileged materials, the review team will: (1) immediately cease its review of the potentially privileged materials at issue; (2) segregate the potentially privileged materials at issue; and (3) take appropriate steps to safeguard the potentially privileged materials at issue.  Nothing in this Instruction shall be construed to require the Review Team to cease or suspend review of all the seized material upon discovery of the existence of potentially privileged materials within a portion of the seized material.

## **CONCLUSION**

119.   Based on the foregoing, there is probable cause to believe, and I do believe, that the Subject Premises will contain the items set forth in Attachment B, which constitute evidence, fruits of crime, contraband, and/or instrumentalities of the violations of Title 18, United States Code, Section 1347 (Health Care Fraud); Title 18, United States Code, Section 1343 (Wire Fraud); Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud and Wire Fraud); 18 U.S.C. § 371 (Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks); and 42 U.S.C. § 1320a-7(b)(1)(A) and 1320a-7(b)(2)(A) (Payment

and/or Receipt of Health Care Kickbacks).

## **REQUEST FOR SEALING**

120. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

_____
Andrew Crump, Special Agent
FBI

Sworn to before me and signed in my
presence and/or by reliable electronic means.

_____
Hon. David R. Grand
United States Magistrate Judge
Eastern District of Michigan

Dated: January 28, 2020

45

# <u>ATTACHMENT A – PREMISES TO BE SEARCHED</u>

Premises to be searched are:

8750 Telegraph Road, Suite 104, Taylor, Michigan 48180, and all buildings, structures, and appurtenances thereof.  This address is located in a mixed commercial area surrounded by other buildings and lots. The building is a multi-story building composed of brick, and there is a blue awning on the front of the business that reads "Seaway Pharmacy" in white lettering. "8750 Telegraph Office Center" is written to the left of the blue awning. There is an exterior door on the outside of the building underneath a blue awning with "313-291-2182" written on the awning. The door has "Seaway Pharmacy" written on it. The business is located on the west side of Telegraph Road just North of Haskell Road.



9934 Harper Avenue, Detroit, Michigan 48213, and all buildings, structures, and appurtenances thereof. This address is located in a mixed commercial area surrounded by other buildings and lots. The building is a multi-story building composed of brick, and there is a circular green sign that reads "Reid's Plaza". There are three green awnings with tan stripes that read "Reid's Community Urgent Care", "Serving You Since 1949", and "St. Paul Pharmacy." There is a sign on western most window of the building that reads "St. Paul Discount Pharmacy" and a sign on the western corner of the building that reads "St. Paul Discount Pharmacy." The business is located on the south side of Harper between Gratiot Avenue and Cadillac Avenue.



211 North Telegraph Road, Monroe, Michigan 48162, and all buildings, structures, and appurtenances thereof. This address is located in a mixed commercial area surrounded by other buildings and lots. The building is a strip mall comprised of multiple businesses. 211 North Telegraph Road, Monroe, Michigan 48162 is located between a Family Dollar and Gen X Games. There is a blue and white sign above the business that reads "Food Town Liquor – Lotto Pharmacy." There is a sign to the left of the entrance that reads "Food Town Pharmacy 734-241-2046 Free Delivery." The business is located on the west side of North Telegraph just south of West Noble Avenue.



32825 Fort Road, Rockwood, Michigan 48173, and all buildings, structures, and appurtenances thereof. This address is located in a mixed commercial area surrounded by other buildings and lots. The building is a strip mall comprised of multiple businesses. 32825 Fort Road, Rockwood, Michigan 48173 is located between a Sav a lot Food Store and Metro PCS. There is a red black and white sign above the business that reads "Rockwood Market Place Deli – Pharmacy Beer & Wine." The numbers "32825" appear right above the entrance to the business. The business is located on the east side of Fort Road and the north side of Huron River Drive.



27260 Eureka Road, Taylor, Michigan 48180, and all buildings, structures, and appurtenances thereof. This address is located in a mixed commercial area surrounded by other buildings and lots. The building is a strip mall comprised of multiple businesses. There is a blue, white, and red sign above the business that reads "ER Drugs Liquor," and another sign that reads "ER Drugs ATM Lotto Beer – Wine Compounding Pharmacy."  The business is located on the north side of Eureka and the East side of Inkster.



625 Brentwood Drive, Dearborn, MI 48124, and all buildings, structures, and appurtenances thereof.  This address is located in residential area surrounded by other residential structures.  It is a residence with an attached garage. The house is constructed with brick exterior. The numbers "625" are displayed to the left of the front door. The subject address is located on the north side of Brentwood Drive in between Willoway Road and North Brady Road.



## ATTACHMENT B – ITEMS TO BE SEIZED

### Subject Premises 1-5

For the period January 4, 2010 to present – any and all of the following items concerning or related to any individual or entity, known or unknown, who is reasonably believed to be part of the pharmacy scheme.  This information may be stored or filed and includes any format in which the information may exist, including, without limitation, the media of hard copy, computer hard disc, digital storage devices, computer discs:

1.      All records related in any way to patients of any of the above persons or businesses, including, without limitation, the following type of records: patient charts, files, records, treatment cards, prescription records, patient ledger cards, patient complaints, patient sign-in sheets, physician notes, nursing notes, medical assistant notes, original patient or referral source listings.

2.      All documents constituting, concerning, or relating to bills, invoices and claims for payment or reimbursement for services billed to insurance companies, including Medicare, for any patients.

3.      All financial and tax-related books, records and documents related in any way to the above persons or businesses, including, without limitation:

   a.  Bank accounts, money market accounts, checking accounts, equity line of credit, investment accounts, stock fund accounts, bonds or bond funds; including deposits and disbursements, canceled checks or drafts, electronic transfers, ledgers, loan statements, and loan agreements;

   b.  Credit/Automatic Teller Machine/Debit card accounts;

    c.  All corporate, business, and personal tax returns, including, without limitation, any quarterly employment tax returns, withholding records, W-2s, and any Internal Revenue Service Form 1099s;

    d.  All loan and credit information, including, without limitation, any letters of credit, revolving credit arrangements, loans, loan applications, financing arrangements, factoring arrangements, promissory notes, leases, or any other documents concerning sources of borrowed funds, including any applications;

    e.  All information relating to the purchase, titling and insurance of vehicles, real estate and other assets, including safe deposit boxes and keys;

    f.  All financial statements, accounts payable/receivable, and credit reports.

4.    All records relating to the ordering, maintenance, or dispensing of controlled substances, non-controlled substances, or other medications, and any and all non-controlled substances and controlled substances in Schedules II, III, IV, and/or V.

5.    All documents consisting, concerning or relating to all current and former employees, including, without limitation, personnel files, employee rosters, names, addresses, telephone numbers, email addresses, time cards or similar records, expense reports, training information, certification verification, salary and compensation information, disciplinary records, licensure records, job applications, job descriptions, employment agreements and W-2 forms.

6.     All documents constituting, concerning or relating to work and personal diaries, calendars, logs, appointment books, and schedules.

7.     All records related to any payments made to patients or recruiters to induce patients to seek treatment from any of the above referenced individuals or business.

8.     All invoices and supporting documentation evidencing monies owed to or received from any of the above referenced individuals or business.

9.     All contracts, billing agreements, professional services agreements, or any other contracts between the above referenced individuals or business, and any other individual, company, physician or billing company.

10.    All Medicare handbooks, manuals, newsletters or other Medicare publications.

11.    Records of control over other areas such as storage units where financial, medical or other billing records may be maintained.

12.    Records of control of the premises and things described, namely, utility bills, telephone bills, rent or lease records pertaining to or evidencing ownership or control of the premises to be searched.

13.    All retrievable information such as recorded telephone messages, and other electronically stored information and computer hardware, including, without limitation, floppy discs, compact discs or other data storage discs or tapes, thumb or flash drives.  Any electronic storage media, including, without limitation, cellular telephones, pagers, electronic organizers, and PDAs, may be held for such

54

reasonable time as necessary to determine whether it contains data within the ambit of this warrant. Where data is found on a personal computer storage drive file, the agents executing this search warrant are authorized to seize, where necessary, the computer system's input/output or "I/O" devices, software, documentation, and data security devices. When the computer analyst determines that these items are no longer necessary to retrieve and preserve that data evidence, they will be returned within a reasonable time.

14.    Instructions, memoranda, passwords, and other information relating to, or required to facilitate the operation of any computer equipment which contains any of the aforesaid information.

15.    Organizational or corporate papers filed with the appropriate state agencies and any amendments thereto, including, without limitation, articles of incorporation, by-laws and annual reports.

16.    All correspondence, including memoranda, letters, and electronic mailings (emails) concerning any of the records described in the previous paragraphs.

17.    Currency or other items of significant value reasonably believed to be proceeds of the illegal activity described in the affidavit for this search warrant.

18.    Records related to assets or items of significant value reasonably believed to be proceeds of the illegal activity described in the affidavit for this search warrant.

***

19.     Regarding records and information pertaining to the above stated offense which may be stored in digital form, law enforcement personnel executing this search warrant will employ the following procedure in searching for data capable of being read, stored or interpreted by a computer:

a.  Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether or not these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

b.  If the computer equipment and storage devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the preservation of the data, then the computer personnel will determine whether it is practical to copy/image the data.

c.  If the computer personnel determine it is not practical to perform on-site searching, copying or imaging (due to time, technical or other considerations), then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review.  The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

d.  Any data storage device that is encrypted and unreadable will not be returned until law enforcement personnel have determined that it or its data do not constitute (1) an instrumentality of the offense, (2) a fruit of the criminal

56

activity, (3) contraband, (4) otherwise unlawfully possessed property, or (5) items that fall within the list of items to be seized set forth within.

e. In searching the data, computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.

f. If the computer personnel determine that the computer equipment and storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41 (b), the government will return these items within a reasonable period of time.

g. In order to search for data pertaining to the above stated offenses that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

   i. Any computer equipment and storage device capable of being used to commit or store evidence of the offenses listed above;

   ii. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including but not limited to word processing equipment, modems, docking stations, monitors, printer, plotters, encryption devices, and optical scanners;

   iii. Any magnetic, electronic or optical storage device capable of storing data such as floppy disks, fixed hard disk drives, external hard drives

and enclosures, network attached storage units, removable hard disk cartridges, tapes, laser disks, videocassettes, CD's, DVD's, zip disks, smart cards, memory sticks, memory calculators, PDA's, USB flash drives, printers and fax machines with memory buffers, PC cards, electronic dialers, electronic notebooks, mobile telephones, answering machines and/or other media that is capable of storing magnetic coding;

iv.    Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices, or software;

v.    Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi.    Any physical keys, encryption devices or similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

vii.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices or data.

20.    The terms records, documents, communications, and applications, includes all of the foregoing items of evidence in whatever form and by whatever means such records, documents, communications, applications, their drafts or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing or drawing with any implement, on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negative, videotapes, photocopies); any mechanical form (such as printing or

typing); any electrical, electronic or magnetic form (such as tape recordings, cassettes, compact discs, or any information on an electronic or magnetic storage device, such as floppy diskettes, hard drives, backup tapes, CD ROMs, optical discs, printer buffers, smart cards, memory calculators, or electronic notebooks, as well as printouts and readouts from any magnetic storage device).

## **Subject Premises 6**

For the period January 4, 2010 to present – any and all of the following items concerning or related to any individual or entity, known or unknown, who is reasonably believed to be part of the pharmacy scheme.  This information may be stored or filed and includes formats including:

1.      All financial and tax-related books, records and documents related in any way to Seaway, including, without limitation:

    a.  Bank accounts, money market accounts, checking accounts, equity line of credit, investment accounts, stock fund accounts, bonds or bond funds; including deposits and disbursements, canceled checks or drafts, electronic transfers, ledgers, loan statements, and loan agreements;

    b.  Credit/Automatic Teller Machine/Debit card accounts;

    c.  All corporate, business, and personal tax returns, including, without limitation, any quarterly employment tax returns, withholding records, W-2s, and any Internal Revenue Service Form 1099s;

    d.  All loan and credit information, including, without limitation, any letters of credit, revolving credit arrangements, loans, loan applications, financing arrangements, factoring arrangements, promissory notes, leases, or any other documents concerning sources of borrowed funds, including any applications;

    e.  All information relating to the purchase, titling and insurance of vehicles, real estate and other assets, including safe deposit boxes and keys;

f.   All financial statements, accounts payable/receivable, and credit reports.

2.      All documents consisting, concerning or relating to all current and former employees, including, without limitation, personnel files, employee rosters, names, addresses, telephone numbers, email addresses, time cards or similar records, expense reports, training information, certification verification, salary and compensation information, disciplinary records, licensure records, job applications, job descriptions, employment agreements and W-2 forms.

3.      All documents constituting, concerning or relating to work and personal diaries, calendars, logs, appointment books, and schedules.

4.      All records related to any payments made to patients or recruiters to induce patients to seek treatment from any of the above referenced individuals or business.

5.      All invoices and supporting documentation evidencing monies owed to or received from any of the above referenced individuals or business.

6.      All contracts, billing agreements, professional services agreements, or any other contracts between Seaway, and any other individual, company, physician or billing company.

7.      All Medicare handbooks, manuals, newsletters or other Medicare publications.

8.      Records of control over other areas such as storage units where financial, medical or other billing records may be maintained.

61

9.      Records of control of the premises and things described, namely, utility bills, telephone bills, rent or lease records pertaining to or evidencing ownership or control of the premises to be searched.

AUSA:   Claire Sobczak          Telephone:  (202) 591-5418

AO 93  (Rev. 11/13) Search and Seizure Warrant          Agent:          Andrew Crump          Telephone:  (313) 670-5817

# UNITED STATES DISTRICT COURT

for the

Eastern District of Michigan

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No. |
| | ) |
| Seaway Pharmacy | )          20-50138-1 |
| 8750 Telegraph Road, Suite 104, | ) |
| Taylor, Michigan 48180 | ) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ Michigan _____ .
*(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

**YOU ARE COMMANDED** to execute this warrant on or before   February 11, 2020 _____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to  the presiding United States Magistrate Judge on duty .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   January 28, 2020   11:14 am _____

_____
*Judge's signature*

City and state:   Detroit, MI _____          David R. Grand          U. S. Magistrate Judge
_____
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*